## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LUCRECIOUS TOWERS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 17 C 7481 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| CHRISTINE BRANNON, Warden, | ) | |
| Hill Correctional Center,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Lucrecious Towers was convicted of first-degree murder by an Illinois jury in 2007 and sentenced to 100 years in prison. The jury found that Towers had shot John Falls in the drive-through lane of a fast-food chain restaurant in Chicago on January 14, 2006. At trial, Towers had argued that he had been mistakenly identified and that another man, Aarian Bonds, was the true shooter of Falls, but the jury disagreed.

After exhausting state court remedies, Towers brought this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting violations of due process, ineffective assistance of counsel, and actual innocence. The Court previously denied Towers's petition as to his due process and actual innocence claims, but reserved ruling on the merits of his ineffective assistance of counsel claim until it could hold

---

[1]    As warden of Towers's present correctional center, Christine Brannon is automatically substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d) and Rule 2(a) of the Rules Governing Section 2254 Cases. The Court will refer to Respondent as "the State."

an evidentiary hearing. That claim is now ripe for decision. For the reasons set forth below, the Court grants Towers's petition.

## I. Background

### A. State Court Proceedings

A detailed description of Towers's state court proceedings is set forth in the Court's prior order. *See* Mem. Op. Order at 2–10, ECF No. 25; *Towers v. Lawrence*, No. 17 C 7481, 2019 WL 4166869, at *1–5 (N.D. Ill. Sept. 3, 2019). A summary of the more salient aspects follows.

### 1. Conviction and Underlying Facts

A jury convicted Towers of the first-degree murder of Falls on September 19, 2007. *See People v. Towers*, No. 1-14-1474, 2016 WL 7434788, at *4 (Ill. App. Ct. Dec. 23, 2016). The following facts were presented at trial.[2]

In the early hours of January 14, 2006, Falls was driving a Jeep Trailblazer near South Emerald Street and West 56th Street in Chicago. *Id.* at *1. Three others were also in the car: Christopher Doss, James Harper, and April McFulson. *Id.* The foursome was in the area because Falls was looking for his ex-girlfriend, Ebony Ester, who was staying nearby with her new boyfriend. *Id.* at *2.

Falls drove north on Emerald and pulled up behind a gray Ford Focus that was stopped in the street, blocking the northbound lane. *Id.* at *1. Next to the Focus was a white Pontiac Bonneville. *Id.* Falls honked his horn, drove around the Focus, and

---

[2]    In habeas proceedings, a federal district court presumes that the state court's factual findings are correct, *see Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1)), and neither party challenges that presumption here.

continued north. *Id.* He then pulled into an alley nearby, exited his vehicle, and confronted the driver of the Focus. A fight ensued. *Id.*

At this point, the driver of the Bonneville pulled up to the alley and got out of his car, after which Doss and Harper exited the Trailblazer. *Id.* Doss began fighting with the Bonneville driver, while Harper joined Falls in fighting the Focus driver. *Id.* Harper hit the Focus driver with a vodka bottle, causing him to fall to the ground; the Bonneville driver then fled on foot. *Id.* Harper proceeded to get into the Focus and crashed it into a tree. *Id.* Harper, Doss, and Falls then rejoined McFulson in the Trailblazer and drove away. *Id.*

Meanwhile, the Bonneville driver returned to his car and began to pursue the Trailblazer, ultimately rear-ending it and causing it to collide with a parked vehicle. *Id.* at *2. The Bonneville driver then sped away. *Id.*

Falls drove the damaged Trailblazer to 69th Street and Wentworth Avenue and parked it in front of Harper's house. *Id.* The foursome got into Harper's truck, drove to a police station to file a report, and then proceeded to a party, where they stayed until 6:00 or 6:30 in the morning. *Id.*

After the party, McFulson and Falls went to Falls's sister's house, where they slept until noon. *Id.* Falls then borrowed his sister's white Volkswagen Touareg, and he and McFulson drove to a Popeye's Louisiana Kitchen located at 75th Street and Lafayette Avenue. *Id.*

As Falls and McFulson waited in the drive-through lane, a man walked up to the driver's side of the Touareg and fired six or seven shots through the window. *Id.*

The shooter pulled a hood over his face and disappeared around the corner. *Id.* McFulson eventually ran inside and told someone to call the police. *Id.* Falls died after suffering five gunshot wounds to his left side. *Id.* at *3.

Detectives Paul Spagnola and Rick Harrison were assigned to investigate the shooting. *Id.* at *2. They interviewed witnesses, who described the shooter as a Black male, between 26 and 27 years old, approximately 5'8" tall, weighing approximately 160 pounds, and wearing a dark leather jacket, dark clothes, and a hooded sweatshirt with the hood down. *Id.* McFulson stated that she saw the man walk up to the Touareg's driver's-side window before lowering her head to avoid falling glass from the shooting. Another witness, Edwina Ross, said that she had been sitting in a car in front of the Touareg and saw the entire scene unfold. *Id.*

Detectives Spagnola and Harrison also went to 5639 South Emerald Street to look at a dark blue 1992 Chevrolet Lumina, which matched the description of the car that witnesses had described as the getaway car. The Lumina was registered to Marco McNeal. *Id.* at *2.

Two days after the shooting, Detective Spagnola composed a black-and-white photo array to show to Doss, Harper, and McFulson. The array included photographs of McNeal and another individual, Aarian Bonds. But the array did not include a picture of Towers, who presumably was not a suspect at that time. *Id.* at *3.

After reviewing the photo array, Doss said that McNeal looked like the Focus driver from the traffic altercation and that Aarian Bonds resembled the Bonneville driver. *Id.* Harper also identified McNeal as the Focus driver. *Id.* McFulson was

4

unable to make any identifications from the array. *Id.*

From this, Detective Spagnola turned his attention to McNeal and Aarian Bonds. He was unable to locate McNeal, but managed to interview Aarian and his brother, Carlos Bonds. *Id.* at *3. It was based upon these interviews that Detective Spagnola shifted the focus of his investigation to Towers. *Id.*

Detective Spagnola created a second photo array with color photographs of Towers and an individual named Terrence Cobb (but not of McNeal or Aarian Bonds), and showed it to Doss, Harper, McFulson, and Ross. *Id.* This time, Doss and Harper identified Cobb as the driver of the Focus and Towers as the driver of the Bonneville. *Id.* McFulson identified Towers as the man whom she saw walk up to the Touareg just before the shooting. *Id.* Ross identified Towers as the shooter as well. *Id.*

Based on these identifications, Towers was arrested in March 2006 and placed in a lineup. *Id.* Doss, Harper, McFulson, and Ross each identified Towers from the lineup consistent with their identifications from the second photo array. *Id.*

Towers's case went to trial in 2007. At the trial, Doss, Harper, McFulson, Ross, and Detective Spagnola each testified to the facts described above. *Id.* at *1–3. Doss and Harper identified Towers as the Bonneville driver with whom they had fought, and McFulson identified Towers as the person whom she saw walk in front of the Touareg before the gunshots. *Id.* at *1–2. Ross also identified Towers as the person who fired multiple shots at the Touareg in the drive-through lane of the Popeye's. *Id.* at *2.

After the prosecution rested, the defense called Carlos Bonds, who testified

that, in January 2006, he had been living with his brother, Aarian Bonds, at 5638 South Emerald Street. *Id.* at *3. He explained that both Aarian and Towers drove white Bonnevilles and wore their hair in braids. *Id.* Carlos Bonds also testified that Aarian was dating Ebony Ester at the time of the incident. *Id.* When asked on cross-examination whether he had told the police on January 14, 2006, and the assistant state's attorney on March 14, 2006, that he had seen Towers driving a dark-colored Lumina, Carlos stated that he had not. *Id.* On rebuttal, however, the assistant state's attorney testified to the contrary. *Id.* at *4.

Towers testified on his own behalf. *Id.* He acknowledged that, in January 2006, he drove a white Bonneville and wore his hair in braids. *Id.* He also stated that he had lived at 5630 South Emerald Street for about a month, and that he was frequently in the area. *Id.* But he denied any involvement in the physical altercation or shooting of January 14, 2006. *Id.* He added that he knew Aarian Bonds and that Aarian also drove a white Bonneville. *Id.*

During closing arguments, defense counsel argued that Aarian Bonds, not Towers, had committed the crime. *Id.* He noted that Aarian Bonds lived near 56th and Emerald Streets, drove a white Bonneville, and wore his hair in braids, just like Towers. *Id.* Counsel also pointed out that Aarian Bonds was dating Falls's ex-girlfriend, whom, according to Harper, Falls had been trying to catch with Aarian Bonds in the early morning hours of January 14, 2006. *Id.* Counsel also attacked the credibility of the prosecution's witnesses and urged that McFulson's and Ross's identifications were unreliable. *Id.*

6

The jury convicted Towers after deliberating for four hours. *See* State Court Records, Ex. R, Pet'r's Trial Tr. at V-136:5–7, V-139:21–141:24 ("Trial Tr."), *People v. Towers*, No. 06 CR 8139 (Cir. Ct. Cook Cnty.), ECF No. 17 at 382–841.  On June 5, 2008, the trial court sentenced him to 100 years of imprisonment.  *See id.*, Ex. S, Pet'r's Posttrial Tr. at 110:11–18, *Towers*, No. 06 CR 8139, ECF No. 17 at 842–954.

### 2.  Direct Appeal

On appeal, Towers sought a new trial based on various evidentiary claims.  *See* State Court Records, Ex. A, Pet'r's Opening Br. on Direct Appeal, *People v. Towers*, No. 1-08-1875 (Ill. App. Ct.), ECF No. 17 at 4–45.  The Illinois Appellate Court affirmed Towers's conviction in March 2010.  *See People v. Towers*, 988 N.E.2d 242 (Table) (Ill. App. Ct. 2010).  The Illinois Supreme Court denied Towers's petition for leave to appeal in May 2010.  *See People v. Towers*, 932 N.E.2d 1036 (Table) (Ill. 2010). The United States Supreme Court denied Towers's petition for a writ of certiorari in November 2010.  *See Towers v. Illinois*, 562 U.S. 1032 (mem.) (2010).

### 3.  Postconviction Petition

Proceeding *pro se*, Towers filed a petition for postconviction relief in the Circuit Court of Cook County in March 2011.  *See* State Court Records, Ex. H, Pet'r's Pro Se Postconviction Pet., *Towers*, No. 06 CR 8139, ECF No. 17 at 142–172.  With the assistance of counsel, Towers filed an amended petition in September 2012, asserting, among other claims, ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, based on trial counsel's failure to investigate McNeal and to call McNeal, Cobb, and another man named Gregory Brooks as

7

witnesses during trial. *See id.*, Ex. I, Pet'r's Counseled Postconviction Pet., *Towers*, No. 06 CR 8139, ECF No. 17 at 173–188. In support, Towers attached affidavits by all three individuals. *See id.* at 9–16. The court dismissed the petition in May 2014, without holding an evidentiary hearing. *See id.*, Ex. J, 5/1/14 Order Dismissing Postconviction Pet., *Towers*, No. 06 CR 8139, ECF No. 17 at 189.

Towers appealed the denial of his postconviction petition. *See id.*, Ex. L, Pet'r's Opening Br. Postconviction Appeal, *People v. Towers*, No. 1-14-1474 (Ill. App. Ct.), ECF No. 17 at 209–68. The Illinois Appellate Court affirmed in December 2016, reasoning that "[d]ecisions concerning which witnesses to call at trial . . . are matters of trial strategy and are generally immune from claims of ineffective assistance," and, while "[t]he failure to interview witnesses" may indicate deficient performance under the first prong of *Strickland*, "none of the affidavits attached to [Towers's] amended petition support his claim that his trial attorney failed to interview McNeal, Brooks, and Cobb." *Towers*, 2016 WL 7434788, at *9. Moreover, "regardless of whether counsel's performance was deficient" under the first prong of *Strickland*, the court held that Towers "failed to establish a reasonable probability that he would not have been convicted had McNeal, Brooks, and Cobb testified" and, thus, did not show prejudice as required under the second prong of *Strickland*. *Id.* at *10.

The Illinois Supreme Court denied Towers's petition for leave to appeal in May 2017. *See People v. Towers*, 84 N.E.3d 367 (Table) (Ill. 2017).

**B.   Federal Habeas Proceedings**

Having exhausted his state court remedies, Towers filed *pro se* the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in 2017, raising three claims: (1) denial of due process, based on two evidentiary rulings from his trial; (2) ineffective assistance of counsel, based on trial counsel's failure to investigate McNeal and to call McNeal, Brooks, and Cobb as witnesses, and (3) actual innocence. *See* Pet. Writ Habeas Corpus, ECF No. 7; Am. Pet. Writ Habeas Corpus, ECF No. 19.

### 1.    Initial Decision

The Court issued its initial decision on September 3, 2019. *See Towers*, 2019 WL 4166869. The Court denied the petition as to Towers's due process and actual innocence claims. *Id.* at *6–7, *12. But the Court allowed Towers's ineffective assistance claim to proceed to an evidentiary hearing. *Id.* at *12.

In doing so, the Court held that the Illinois Appellate Court had applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Id.* at *9. As to *Strickland's* first prong—deficient performance—the Court found that the state court's conclusion that "none of the affiants swore that they were not contacted by an attorney or investigator regarding [Towers's] trial" was contradicted by McNeal's affidavit and, therefore, the conclusion was unreasonable. *Id.* (quoting *Towers*, 2016 WL 7434788, at *9). And given that "[s]trategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation," the Court found that it also was unreasonable for the state court to presume on the limited record before it that

9

Towers's counsel's failure to call McNeal and the others as witnesses was based on a deliberate, strategic decision. *Id.* at \*10 (quoting *Strickland*, 466 U.S. at 690–91).

As to *Strickland*'s second prong—prejudice—the Court found unreasonable the state court's assertion that McNeal, Brooks, and Cobb would not have been useful witnesses simply because they "were not at the scene of the shooting," even though their statements cast significant doubt on the prosecution's theory that Towers had murdered Falls as payback for the altercation. *Id.* at \*11 (quoting *Towers*, 2016 WL 7434788, at \*9).

At the same time, the Court found that it needed to hold an evidentiary hearing on Towers's ineffective assistance claim before it could determine whether Towers is entitled to habeas relief. *Id.* at \*12. That is, while a conclusion that the "state court's decision denying relief was contrary to or an unreasonable application of federal law . . . will often show that the petitioner is entitled to relief," that was not so here because it did not mean the affidavits supporting Towers's postconviction petition "are actually true or that they provide the complete picture of the facts relevant to [his] claim of ineffective assistance of counsel." *Id.* (quoting *Mosley v. Atchison*, 689 F.3d 838, 852 (7th Cir. 2012)). And because the state court had denied Towers an opportunity to explore those facts, the Court could not "assess the scope of trial counsel's investigation and decisionmaking without a hearing." *Id.*

## 2.    Evidentiary Hearing

After being delayed by the onset of the COVID-19 pandemic, the evidentiary hearing on Towers's ineffective assistance of counsel claim took place on October 2,

2020. *See generally* 10/2/20 Hr'g Tr., ECF No. 61. Through the assistance of counsel whom the Court recruited to assist with the hearing, Towers called four witnesses: McNeal, Brooks, Cobb, and his trial counsel. Each testified as follows.

### a.   McNeal

In January 2006, McNeal was living on the South Side of Chicago, where he was paroled after having been released from prison in August 2005. *Id.* at 11:16–12:19. As a parolee, McNeal was required to check in at a center every day by signing a book, which he did without exception, and his parole officer knew his address and cell phone number. *Id.* at 12:14–16, 12:20–13:23. McNeal's friends and family also knew where he lived, and he continued to live there until he was again incarcerated (for an unrelated offense) from May 2007 into 2008. *Id.* at 13:14–20, 14:9–20.

In January 2006, McNeal owned a navy blue 1992 Chevrolet Lumina Eurosport, with a red stripe across the sides, that was registered in his name. *Id.* at 8:8–9, 16:6–17:2, 43:1–12. Although McNeal rarely drove the Lumina himself at the time, *id.* at 17:3–13, he often lent it to his close friend Aarian Bonds, whom he had known for years and trusted with his car, and did so around that very month. *Id.* at 18:23–20:22. He lent it because he understood that Aarian's white Pontiac Bonneville had been "torn up" in an altercation involving Aarian's girlfriend's ex-boyfriend and Aarian's brother, Carlos Bonds, whom the ex-boyfriend had mistaken for Aarian. *Id.* at 20:23–21:9, 22:2–15. When Aarian brought the Lumina back, he said that he had "taken care of" the damage to his Bonneville by making "the guy" who caused the damage "pay for it." *Id.* at 25:18–26:8, 26:15–20.

11

McNeal did not know that his Lumina had been identified as the getaway car, or that Towers had been convicted of the murder, until years later. *Id.* at 6:8–15, 8:4–6, 14:24–15:1, 50:8–25. He was never contacted by the police in connection with the shooting. *Id.* at 9:5–7. Nor was he ever contacted by Towers's trial counsel or anyone else in connection with Towers's trial. *Id.* at 4:21–23, 8:25–9:4, 15:2–13. Although McNeal had known of Towers from living in the same area, he had never met Towers or allowed Towers in his Lumina. *Id.* at 7:11–8:21, 39:24–40:3. Had McNeal been contacted by trial counsel, he would have been able and willing to share the above information, notwithstanding his friendship with Aarian Bonds, who passed away sometime after Towers's trial. *Id.* at 15:14–21, 23:25–28:14.

### b.    Brooks

In January 2006, Brooks was living on West Garfield Boulevard (one block north of West 56th Street) between South Emerald Street and South Halsted Street. *Id.* at 58:17–25. One night that month, after dark, Brooks witnessed an altercation in the alley outside the window of his room. *Id.* at 56:18–22, 63:23–64:18, 65:6–10. The altercation involved five or six larger men, about 6'3" or taller. *Id.* at 64:16–65:19. Towers, who stood 5'5" tall and whom Brooks knew from the neighborhood, was not among them. *Id.* at 56:23–57:15, 58:12–13, 65:17–66:5. Brooks also knew Aarian Bonds, because Brooks was best friends with Aarian's brother, Carlos Bonds. *Id.* at 57:16–22. Aarian stood about 6'3" tall. *Id.* at 58:10–11. Carlos and Towers knew each other as well, and Brooks had observed them get into a fight of their own a short while before the fight in the alley. *Id.* at 67:2–24.

12

Brooks was never contacted by the police, an attorney, or an investigator in connection with the altercation, Falls's murder, or Towers's trial. *Id.* at 55:18–56:4, 60:2–19. However, Brooks was subpoenaed to testify at Towers's trial and transported to the courthouse by his then-facility of incarceration, although he was never called and does not know which side subpoenaed him. *Id.* at 61:15–63:17.

### c. Cobb

One night in late December 2005 or early January 2006, Cobb was involved in a fight on the South Side of Chicago. *Id.* at 88:15–23, 97:9–14, 103:9–16, 121:11–123:1. He was walking northbound on South Emerald Street near West Garfield Boulevard when a grey Jeep SUV pulled up from behind. *Id.* 88:20–23, 97:11–21. The driver rolled down the window and asked Cobb whether he know whose house he was walking by and whose car—a white Pontiac Bonneville—was out front. *Id.* at 88:23–25, 89:5–14, 98:12–15, 99:21–22. Cobb knew that the house and car belonged to Aarian Bonds because he was friends with Aarian and had been inside of both. *Id.* at 89:8–25, 91:9–21, 99:1–12. But fearing that the driver, whom Cobb did not recognize from the neighborhood, meant to harm Aarian, Cobb told him sarcastically to find out for himself if he wanted to know. *Id.* at 89:14–19, 98:12–25.

Upset, the driver got out of the Jeep and started screaming at Cobb. *Id.* at 99:24–100:5. Then two or three passengers got out as well, and the group began to beat and trample Cobb, until someone hit him in the face with a vodka bottle and knocked him unconscious. *Id.* at 90:1–8, 100:5–10, 101:3–6. Towers, whom Cobb knew from the neighborhood, was not among the occupants. *Id.* at 90:9–25, 100:12–

13

15.  By the time of Towers's trial, Cobb had heard that Aarian Bonds was dating the ex-girlfriend of one of the occupants at the time of the fight.  *Id.* at 102:5–17.

Cobb spoke with homicide detectives about the altercation outside of Aarian Bonds's house sometime later, while being booked for an unrelated trespassing.  *Id.* at 93:19–94:21.  The detectives asked Cobb whether Towers was involved in the incident, to which Cobb said no.  *Id.* at 94:16–17.  Aside from that conversation, Cobb did not speak to the police about Falls's murder or Towers's arrest and trial.  *Id.* at 94:22–95:1.  Similarly, Cobb was never contacted in connection with Towers's trial and did not receive a subpoena to testify.  *Id.* at 88:3–5, 95:2–25.

### d.    Trial Counsel

Towers's trial counsel, then a Cook County Public Defender, was appointed to represent Towers in March 2006, over seventeen months before trial began.  *Id.* at 126:21–128:14, 129:20–23.  In preparing for trial, trial counsel had the full resources of the Public Defender's Office to available to him, including a capable assistant to help conduct investigations.  *Id.* at 129:24–130:17, 134:20–135:2.

Among other things, trial counsel tasked his assistant with serving subpoenas on witnesses and locating McNeal's blue 1992 Chevrolet Lumina, which he understood to be the getaway car.  *Id.* at 130:18–22, 131:17–22, 134:3–18.  But, significantly, trial counsel has no memory of requesting his assistant to investigate McNeal as a witness, of personally interviewing McNeal, or making any other efforts to contact McNeal.  *Id.* at 135:3–6, 135:11–136:6, 141:8–10, 170:24–171:2.  Likewise,

trial counsel has no memory of attempting to interview or otherwise investigate Brooks or Cobb. *Id.* at 135:7–10, 136:8–138:12.

To be sure, trial counsel was aware of McNeal and knew that Chicago police had located his blue Chevy Lumina at 5639 South Emerald Street in January 2006. *Id.* at 141:13–143:9. From the report, trial counsel also knew that McNeal fit the description of one of the individuals involved in the altercation preceding the murder, and had just recently been released from the Illinois Department of Corrections. *Id.* at 143:10–144:9. Trial counsel even knew that Doss and Harper had identified McNeal as one of the individuals from the altercation after viewing a photo array, and that Doss had described McNeal as having the physique of someone who just got out of prison. *Id.* at 145:10–146:16, 146:24–147:13. And yet, despite having the resources to track down McNeal's probation officer and, from there, find and interview McNeal, trial counsel does not recall having done so. *Id.* at 144:10–145:8, 147:25–148:11.

Although trial counsel does not recall having interviewed McNeal, trial counsel also does not recall making a conscious decision not to interview him. *Id.* at 157:21–23. At the same time, trial counsel testified that he "had [his] reasons for not wanting to talk to" McNeal. *Id.* at 158:15–16; *see also id.* at 141:5–6. Primarily, trial counsel "thought [McNeal] had information that could implicate [Towers] in the crime" *Id.* at 161:10–11. In this respect, trial counsel distinguished between the "theory of [the] case" that he would present at trial—that Aarian Bonds was the shooter, and McNeal the getaway driver—versus his "idea of what actually happened"—that Towers was

15

the shooter, and McNeal *his* getaway driver. *Id.* at 159:5, 180:15; *see also id.* at 157:6–10, 161:24–25, 178:3–10, 190:1–4. Given that, trial counsel feared that approaching McNeal would cause him to implicate Towers to the authorities. *See id.* at 157:12–15, 158:17–20; 169:5–8, 189:7–10.

At the same time, trial counsel did not investigate his assumption that Towers and McNeal knew each other. *See id.* at 159:8–10. In fact, although Towers had said that he and McNeal did not know each other, trial counsel's fear that McNeal would contradict Towers's story—along with the concern that McNeal might implicate Towers—was another reason why trial counsel did not attempt to contact McNeal. *Id.* at 188:23–189:9; *see also id.* at 181:20–25, 187:20–188:9. And given that the State and City of Chicago had been reportedly unable to locate McNeal, trial counsel figured it was "best to leave him alone" and not "stir the pot." *Id.* at 188:1–4, 189:5; *see also id.* at 140:24–141:2, 170:14–17, 172:19–22, 192:20–24.

In addition to McNeal, trial counsel was aware that, in a police report prepared in early March 2006, Carlos Bonds had identified Gregory Brooks as a witness to the roadside altercation on South Emerald Street. *Id.* at 150:20–152:25, 153:19–21. In the report, Bonds also stated that Towers and Cobb had been involved in the fight. *Id.* at 153:1–18. In another police report of which trial counsel was aware, Doss had identified Cobb as both Towers's companion in the fight and the driver of the Ford Focus. *Id.* at 153:23–155:6. But trial counsel never made an attempt to contact either Brooks or Cobb. *Id.* at 155:13–20; 192:13–18.

## II.     Legal Standard

16

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, a petitioner in custody pursuant to the judgment of a state court must make two showings to demonstrate an entitlement to a writ of habeas corpus: (1) "that he is in custody in violation of the Constitution or laws or treaties of the United States," *id.* § 2254(a); and (2) that the state postconviction court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)–(2).

If the petitioner satisfies the § 2254 prerequisites, he must then persuade the court that "law and justice require" habeas relief. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (quoting 28 U.S.C. § 2243); *see id.* ("[A] federal court must deny relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to grant relief, a court must find that the petitioner has cleared both tests."). And where the petitioner's habeas claim is based on trial error, he must prove that the error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 775 (1946)); *see Brown*, 142 S. Ct. at 1525.

Here, the Court has already determined that the state court's postconviction denial of Towers's ineffective assistance claim involved an unreasonable application of *Strickland*. *See Towers*, 2019 WL 4166869, at *9–11. What remains to be

17

determined is whether Towers "is actually . . . in custody in violation of the Constitution . . . of the United States"—that is, whether trial counsel actually rendered ineffective assistance by failing to investigate McNeal or to call McNeal, Brooks, and Cobb as witnesses. *Mosley*, 689 F.3d at 853. Towers bears the burden of proving these allegations by a preponderance of the evidence. *Dalton v. Smith*, No. 97 C 2368, 2005 WL 3455866, at *4 (N.D. Ill. Dec. 16, 2005) (St. Eve, J.) (citing *Walker v. Johnston*, 312 U.S. 275, 286 (1941)).[3]

Under *Strickland*, a convicted defendant claiming ineffective assistance must demonstrate two things: (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687. The first prong requires a showing "that counsel's representation fell below an objective standard of reasonableness," or "outside the wide range of professionally competent assistance," judged "under prevailing professional norms." *Id.* at 688, 690. A court deciding an ineffective assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Additionally, to help eliminate "the distorting effects of hindsight," the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Once the defendant has established that counsel's performance was deficient, he must then demonstrate that counsel's deficient performance prejudiced his

---

[3]     Neither party contends that the clear-and-convincing evidence standard of 28 U.S.C. § 2254(e)(1) applies to the questions of fact at issue here, and for good reason, since the state postconviction court did not make a determination on any of these factual issues. *See* 28 U.S.C. § 2254(e)(1).

defense. To do so, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### III. <u>Analysis</u>

Towers contends that he is in custody in violation of the Sixth Amendment's right to the effective assistance of counsel under *Strickland*, because his trial counsel had failed to investigate McNeal and to call McNeal, Brooks, and Cobb as witnesses. The Court takes each of the *Strickland* prongs in turn.

### A. **Deficient Performance**

### 1. **Trial Counsel's Failure to Investigate and Call McNeal**

The first prong hinges largely on Towers's contention that trial counsel failed to investigate and call McNeal as a witness. As an initial matter, it is undisputed that trial counsel did not investigate McNeal. Consistent with his state court affidavit, McNeal testified that he was never contacted by Towers's defense team and did not know that Towers was convicted of Fall's murder until years afterward. And trial counsel could not recall making any effort to interview or otherwise investigate McNeal, despite knowing that McNeal was the registrant of the suspected getaway car, that he had been identified from the traffic altercation by two of Falls's companions, that he had been recently released from prison, and that (in all likelihood) he had a parole officer who would know his whereabouts. In light of this

testimony, the Court finds by a preponderance of the evidence that trial counsel abjectly failed to investigate McNeal.[4]

From here, the key question is whether trial counsel's failure to investigate McNeal was a based on a conscious strategic decision or the result of casual inattention. As higher courts have "repeatedly emphasized," *Strickland* draws a key distinction "between 'strategic choices made after thorough investigation of law and facts relevant to plausible options,' versus 'strategic choices made after less than complete investigation.'" *Campbell v. Reardon*, 780 F.3d 752, 763 (7th Cir. 2015) (quoting *Strickland*, 466 U.S. at 690–91). Whereas the former "'are virtually unchallengeable,'" the latter "'are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 533 (2003) (quoting *Strickland*, 466 U.S. at 690–91). "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

Here, based on the evidentiary record, the Court finds that trial counsel's failure "to search for or interview McNeal" was not based on a strategic decision at

---

[4] The State tacitly concedes that trial counsel made no effort to investigate McNeal. Although its brief begins with the assertion that "counsel's investigation was adequate," it proceeds to argue only that trial counsel made "a strategic decision *not* to search for or interview McNeal." Resp'ts Resp. to Pet'r's Post–Hr'g Br. ("Resp. Br.") at 4–5, ECF No. 63 (emphasis added).

20

all (or, at least, not one that he could recall). Resp. Br. at 5. At the hearing, trial counsel admitted that, just as he did not recall attempting to interview McNeal, so too he had "no memory of choosing *not* to interview" McNeal. 10/2/20 Hr'g Tr. at 157:21–23 (emphasis added). This admission, which the State fails to address, indicates that, while trial counsel may have had reasons "for not wanting to talk to" McNeal, *id.* at 158:15–16, he never weighed these reasons against the benefits of interviewing McNeal in order to arrive at a strategic decision not to do so.[5] In other words, trial counsel never actually decided *either* to investigate *or* not to investigate McNeal; his "omission to pursue" McNeal as a witness "occurred by default rather than by design." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 249 (7th Cir. 2003). As a result, the Court concludes that trial counsel's omission was "not a strategic decision" and, thus, his failure to pursue McNeal was not reasonable. *Id.*; *see also Mosley*, 689 F.3d at 848 (observing that defense counsel's failure to investigate a witness may be a reasonable strategic judgment "only if the lawyer actually exercised judgment").

But, even setting this testimony aside, and accepting *arguendo* the State's position that trial counsel's failure to interview McNeal was a matter of deliberate trial strategy, the Court can "see no reason in the record" why any strategic decision not to investigate McNeal "would have been reasonable under the circumstances."

---

[5]     Because the State did not respond to Towers's argument that trial counsel's inability to recall "even making a choice not to investigate McNeal" indicates that his omission to so investigate "was not strategic," *see* Pet'r's Opening Br. at 18, ECF No. 62, the State has waived any contention to the contrary. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

*Campbell*, 780 F.3d at 764.  In its brief, the State echoes trial counsel's varying rationales for not contacting McNeal, but the Court finds that none constitute "reasonable professional judgment[s]" under the circumstances.  *Strickland*, 466 U.S. at 691.

First, the State contends that trial counsel did not contact McNeal because he feared that doing so would prompt McNeal to "flip" on Towers out of fear that the investigation was circling in on McNeal.  Given McNeal's potential criminal liability as the alleged getaway driver, the State argues that trial counsel justifiably "was concerned that talking to McNeal would 'stir the pot' and make McNeal 'worried' that petitioner was implicating McNeal in the murder."  Resp. Br. at 5 (quoting 10/2/20 Hr'g Tr. at 189:5–9).  This, the State asserts, might have prompted McNeal to "make a deal with the prosecution" and testify against Towers, a risk trial counsel did not want to take.  *Id.*

Assuming these apprehensions *did* play a role in trial counsel's decision-making, they were speculative and insufficient to justify not investigating McNeal.  Granted, *Strickland* recognizes that, when counsel has "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."  *Strickland*, 466 U.S. at 691.  But Towers correctly points out that trial counsel "identified no facts that Towers told him to support [counsel's] assumptions" that McNeal would turn on Towers.  Pet'r's Reply Br. at 3.  Trial counsel knew only a few facts about McNeal: that he owned the 1992 Lumina that served as the getaway car,

10/2/20 Hr'g Tr. at 141:13–143:9; that he was placed at the scene of the fight in the early morning by multiple prosecution witnesses, *see id.* at 141:10–13; that he had recently been released from prison, *id.* at 143:11–24; and that, according to his client, he had no prior relationship with Towers. *Id.* at 188:19–189:2. These facts do not support in any way trial counsel's belief that McNeal would inculpate Towers.

Absent a factual justification for his theory, trial counsel apparently relied on his "understanding" of the crime—that Towers was guilty and McNeal was his getaway driver. But the State fails to show that trial counsel's "understanding" that his client was guilty was itself objectively reasonable under the circumstances.

Although the State maintains that Towers supplied trial counsel with "crucial information" to support his hypothesis, the inquiry at the hearing into their conversations did not disclose any such information. Quite the contrary, trial counsel's hypothesis is contradicted by the only detail he identified from those conversations: that Towers denied so much as knowing McNeal. *See id.* at 159:11–19, 162:4–9, 188:23–24. And yet, to substantiate trial counsel's disbelief of that denial, the sole testimony that the State identifies is that Towers gave him "all this information" about McNeal such that "a person would logically think" they knew each other. *Id.* at 188:25–189:1. The content of that information remains a mystery. In fact, while trial counsel was "sure" that he and Towers had discussed McNeal, he had "no memory" of such a discussion. *Id.* at 168:3–5. In any event, that Towers may have known *about* McNeal hardly indicates that he *personally* knew McNeal, let alone that he conspired with McNeal to commit the murder. Thus, while the Court is

23

sympathetic to the difficulty of recalling events from over a decade ago, the hypothesis on which the State premises trial counsel's purportedly strategic decision not to investigate McNeal finds no basis in the record before it.[6]

Of course, the State also stresses that trial counsel had reason to believe that McNeal was the getaway driver, especially given that the suspected getaway car was registered to him.[7] But trial counsel's belief that McNeal was *Towers's* getaway driver—and thus someone who may have been able to inculpate, not exculpate, his client—depended on his underlying assumption that Towers was guilty. Were it not for that assumption, trial counsel would not have feared that approaching McNeal may have caused him to 'flip'—*i.e.*, to "make a deal with the prosecution in exchange for testifying against [Towers]" as the government's "best witness." Resp. Br. at 5–6 (citing 10/2/20 Hr'g Tr. at 187:20–25).[8] Instead, trial counsel would have seen McNeal

---

[6] While the State argues that trial counsel "understandably could not remember the 'specific back-and-forth'" of his conversations with Towers, it fails to show that trial counsel's inability to remember such details (however understandable) may substitute for actual evidence of the information that it asserts justified trial counsel's omission to investigate McNeal. Resp. Br. at 5 (quoting 10/2/20 Hr'g Tr. at 189:20–21).

[7] The State's assertion that trial counsel "learned" as much from Towers, however, is unsupported by the record. Resp. Br. at 5 (citing 10/2/20 Hr'g Tr. at 189:13–190:4). To the contrary, trial counsel testified that Towers did *not* tell him that McNeal was the driver and that he could not "remember" what Towers *did* tell him about McNeal, before proceeding to speak hypothetically in the lines cited by the State. 10/2/20 Hr'g Tr. at 189:13–190:4.

[8] Even assuming that McNeal *were* Towers's own getaway driver, it could hardly be taken as given that the prosecution would have offered him a deal in exchange for testifying against Towers or that he would have accepted any such deal, as the State suggests. As for the State's contention that trial counsel feared McNeal might say that he "was *not* the driver" if interviewed, the State again puts words into trial counsel's mouth. Resp. Br. at 6 (citing 10/2/20 Hr'g Tr. at 172:11–18 (emphasis added)). In the cited passages, trial counsel was merely responding to the State's hypothetical questions, not providing reasons why he did not investigate McNeal. *See* 10/2/20 Hr'g Tr. at 172:11–18; *see also id.* at 190:5–14.

as potentially the best witness (and at worst a neutral witness) *for* his defense theory that Aarian Bonds was the shooter and someone who may well have added to, not threatened, his "presentation of what appeared to be the best available defense theory." *See id.* at 6.

Furthermore, the State supposes that trial counsel did not pursue McNeal because, if McNeal had informed counsel that he and Towers knew one another, "ethical prohibitions against knowing presentation of false information" would have prohibited counsel from arguing that they did not. Resp. Br. at 5; *cf.* ILL. S. CT. R. PROF. CONDUCT 3.3(a)(3) (providing that a lawyer "shall not knowingly . . . offer evidence that the lawyer knows to be false"). In this respect, the State points to trial counsel's concern that interviewing McNeal would have caused him to "lose" the theory that Towers and McNeal did not know each other. 10/2/20 Hr'g Tr. at 188:23–24. But even assuming McNeal would have contradicted Towers on this point, such "conflicting evidence" would not have furnished the requisite knowledge that Towers's testimony was false. *United States v. Marshall*, 157 F.3d 477, 484 (7th Cir. 1998) ("The fact that the confession was countered by conflicting evidence does not mean that it was 'false.'"). And even if trial counsel reasonably believed McNeal's version of events, he still would have been not simply allowed, but *required* to offer Towers's version. *See* ILL. S. CT. R. PROF. CONDUCT 3.3(A)(3) (providing that a lawyer may not "refuse to offer . . . the testimony of a defendant in a criminal matter[] that

25

the lawyer reasonably believes is false").[9]  In this way, ethical prohibitions posed no obstacle to trial counsel's investigation of McNeal.

At bottom, trial counsel's justification for not investigating McNeal as a potential witness boils down to trial counsel's mere suspicion that Towers was guilty. As the Seventh Circuit has recognized, however, such suspicion does not excuse the abject failure to investigate key witnesses, especially "[i]n a first-degree murder trial." *See Raygoza v. Hulick*, 474 F.3d 958, 964 (7th Cir. 2007).  In *Raygoza*, the petitioner had been convicted of murder after the jury rejected his alibi defense. *Id.* at 961.  On the way to granting habeas relief, the court held that his defense counsel performed deficiently by failing to investigate and call certain alibi witnesses. *Id.* at 964–65.  Even surmising that defense counsel "had formed an opinion about [the petitioner's] guilt in his own mind and thought that an alibi would be futile," the court found it "almost impossible to see why a lawyer would not at least have investigated the alibi witnesses more thoroughly." *Id.* at 964.  After all, any suspicion that his client was guilty "would hardly distinguish [the attorney] from legions of defense counsel who undoubtedly do the same every day, yet who conscientiously investigate their clients' cases before coming to a final decision about trial strategy." *Id.*; *see also Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006) (holding that defense counsel

---

[9]    It is worth noting that trial counsel acted consistently with this understanding of Rule 3.3(a)(3) by offering evidence at trial to the effect that Towers and Aarian Bonds looked alike, even though he conceded at the hearing that, in his own opinion, Aarian "looked nothing like" Towers. *Compare* Trial Tr. at V-96:7–18, *with* 10/2/20 Hr'g Tr. at 175:14.

performed deficiently by failing to interview "key actual or potential witnesses" in another first-degree murder case).[10]

Trial counsel's reliance on his "understanding" of Towers's guilt also falls short of "reasonable" representation as measured by the "prevailing professional norms." *Strickland*, 466 U.S. at 688. The American Bar Association's guidelines for defense counsel in effect at the time of Towers's trial state that "counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case . . . . *regardless of the accused's admissions or statements to defense counsel of facts constituting guilt.*" AM. BAR ASS'N, ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1 (3d ed. 1993) (emphasis added). To the extent that trial counsel declined to pursue potentially meritorious defenses or investigations because he believed, or because he feared he would discover, that Towers was guilty, he did not meet this standard.

Furthermore, even if the Court gives some weight to trial counsel's "understanding" that McNeal's involvement in the case could potentially backfire, it was still unreasonable for trial counsel to assume that the risk of McNeal "flipping" on Towers outweighed the potential rewards of McNeal's testimony in Towers's defense, given that trial counsel did not have enough information about McNeal's involvement to judge how helpful his testimony would be. *See Mosley*, 689 F.3d at 848 (holding that defense counsel's failure to investigate the contents of witnesses'

---

[10]     In this sense, the Seventh Circuit's recognition that first-degree murder cases call for especially diligent investigation runs counter to trial counsel's suggestion that the murder's uniqueness among crimes contributed to his reasons for *not* wanting to talk to McNeal. *See* 10/2/20 Hr'g Tr. at 187:4–188:9.

potential testimony meant that defense counsel "could not possibly have made a reasonable professional judgment that their testimony would have . . . bolstered the State's case"); *Adams v. Bertrand*, 453 F.3d 428, 437 (7th Cir. 2006) (defense c]ounsel's "commit[ment] to a predetermined strategy without a reasonable investigation that could have produced a pivotal witness" was not reasonable trial strategy).

Indeed, a defense attorney who refuses to investigate a potentially useful defense witness because he is concerned that the witness may disrupt his preexisting theory of the case does not exercise the "reasonable professional judgment[]" that is necessary to justify an incomplete investigation. *Stitts v. Wilson*, 713 F.3d 887, 891 (7th Cir. 2013) (quoting *Strickland*, 466 U.S. at 690–91). This is especially true where, as here, "eyewitness testimony was the linchpin" of the prosecution's case. *Hampton*, 347 F.3d at 249 (defense counsel's failure to contact three eyewitnesses who would have countered the prosecution's identification testimony was an objectively unreasonable judgment); *see id.* at 250–51 (collecting cases).

Citing *Blackmon v. Williams*, 823 F.3d 1088 (7th Cir. 2016), the State contends that "the risk-reward calculation is much different" with respect to witnesses like McNeal, who may have had a role in the crime, compared to those whose involvement does not pose a risk of incriminating the client, such as alibi witnesses. Resp. Br. at 9. But *Blackmon* does not suggest that the former are too risky to bother investigating. The court simply distinguished between such witnesses on the facts of that case. *Id.* at 1103–04. And the court reiterated (with regard to the alibi witnesses

28

whom counsel did not investigate) that counsel cannot know a potential witness's vulnerabilities "without doing at least some investigation of the witnesses." *Id.* at 1105. Thus, notwithstanding the different risk calculations at play, the Court sees no basis to conclude that a defense counsel who suspects his client is guilty need *only* investigate witnesses who are not linked to the crime. That would hardly comport with the duty to "conscientiously investigate" the client's case. *Raygoza*, 474 F.3d at 964.

Beyond his hypotheses that Towers was guilty and that McNeal was his accomplice, the State contends that trial counsel reasonably chose not to investigate McNeal because, "at the time, counsel had reason to believe that attempts to locate McNeal would be futile." Resp. Br. at 7. In this respect, the State underscores trial counsel's testimony that he "had information" to the effect that Chicago police had been "unable to locate" McNeal based on an investigative alert issued in connection with the shooting. 10/2/20 Hr'g Tr. at 166:22–23; *see also id.* at 166:24–167:13. The State also points to trial counsel's "belie[f]" that Towers had told him that McNeal was "not going to be found." *Id.* at 170:12–13.

This argument is unpersuasive for two reasons. For starters, trial counsel did not suggest that he did not investigate McNeal because he could not find him. The closest he came was to say that he "liked [his] ability to argue" that McNeal had "mysteriously disappeared" after the murder, *id.* at 172:19–22, which, as discussed above, shows only that trial counsel "commit[ted] to a defense strategy" without first "perform[ing] a reasonable pretrial investigation." *Campbell*, 780 F.3d at 763. The

State points to no other pertinent testimony. Indeed, the notion that trial counsel did not search for McNeal because he thought the effort would be futile cannot be squared with his testimony that he did not "see anything [to] gain" by searching for McNeal in the first place. 10/2/20 Hr'g Tr. at 189:3.

Even assuming that any belief McNeal would not be found contributed to trial counsel's omission to investigate McNeal, it does not justify that omission any more than the hypothesis that Towers was guilty. To begin, trial counsel could not reasonably have relied on the police's reported inability to locate McNeal. *Cf. Stanley*, 465 F.3d at 813 (holding that trial counsel performed deficiently by relying on a police report to indicate a witness's potential testimony, without personally talking to the witness); *see also Crisp v. Duckworth*, 743 F.2d 580, 584 (7th Cir. 1984) ("We do not agree that police statements can generally serve as an adequate substitute for a personal interview."). That is especially so given that the police's efforts appear to have been based on an investigative alert, which, as trial counsel conceded, serves as a strictly passive notice that the police have reason to speak with someone, "in the event" an officer runs into that person "for whatever reason." 10/2/20 Hr'g Tr. at 147:19–23. And while the State highlights trial testimony stating that the police made "numerous attempts to find" McNeal, the witness did not describe any active effort to do so. *See* Trial Tr. at U-84:12–16.

As to trial counsel's tentative recollection that Towers had told him that McNeal could not be found, the Court discredits it given his earlier testimony that he could not remember the specifics of any conversation he had with Towers about

McNeal. *See* 10/2/20 Hr'g Tr. at 168:3–5. And even assuming Towers did convey as much to trial counsel, that surely would not have excused his total resignation towards McNeal any more than his suspicion that Towers was guilty.

In sum, the Court is compelled to conclude that trial counsel's abject failure to investigate McNeal fell outside the wide range of professionally competent assistance. It follows that trial counsel's failure to call McNeal at trial was equally unreasonable. *See Mosley*, 689 F.3d at 848 ("If . . . [defense counsel] never found out what [the witnesses'] testimony would be, he could not possibly have . . . chosen not to call [them] as a matter of strategy."); *Hampton*, 347 F.3d at 249 ("Only if it was objectively reasonable for [defense counsel] to self-limit his investigation . . . may his 'decision' not to present exculpatory eyewitnesses itself be considered reasonable.").

### 2. Trial Counsel's Failure to Call Brooks and Cobb

Although trial counsel's failure to investigate and call McNeal as a witness is sufficient, in and of itself, to show deficient performance, his failure to call Brooks and Cobb as witnesses also supports such a finding. As with McNeal, the testimony presented at the evidentiary hearing establishes by a preponderance of the evidence that trial counsel made no effort to investigate these witnesses either. What is more, trial counsel did not even suggest that his omission to investigate Brooks or Cobb was the result of a strategic decision. Thus, given that trial counsel identified no reason "to self-limit his investigation" into Brooks and Cobb, it follows once again that his

31

omission to call them at trial cannot "be considered reasonable." *Hampton*, 347 F.3d at 249.[11]

The State does not attempt to defend trial counsel's failure to investigate Brooks as a reasonable strategic decision. Although the State does try to supply reasons why trial counsel's failure to investigate Cobb was reasonable, that effort falls flat. Simply put, trial counsel did not identify any "downside" to interviewing Cobb that caused him to decide against doing so. 10/2/20 Hr'g Tr. at 155:24–156:11.

Again, assuming for the sake of argument that trial counsel consciously chose not to investigate Brooks or Cobb, the Court can see no way such a decision could be considered "reasonable." Brooks and Cobb's involvement presented no putative "flipping" concern, because Brooks and Cobb were not suspected as potential codefendants in the murder. Even when the State sought to have trial counsel testify that Cobb, like McNeal, was too risky to investigate, trial counsel could not articulate any such theory. *See id.* at 181:17–182:6. Trial counsel was aware that both Brooks and Cobb were eyewitnesses to the fight in the early morning of the 14th, *see* 10/2/20 Hr'g Tr. at 153:14–22, and despite knowing that the prosecution's theory of the case involved placing Towers at the scene of that fight, *see id.* at 179:7–12, he failed to present either witness to impeach the state's witnesses, Doss and Harper, who testified that Towers was the driver of the Bonneville. *See Towers*, 2019 WL 4166869,

---

[11]    Although the State contends that the Court may not consider trial counsel's failure to *investigate* Brooks and Cobb as witnesses, as opposed to his failure to *call* them as witnesses, because Towers has not exhausted a claim at to the former, the interrelatedness of these twin failures in this case not only allows, but requires the Court to consider trial counsel's failure to investigate them in assessing the reasonableness of his failure to call them.

at *9. The Seventh Circuit has noted that defense counsel's failure to call eyewitnesses to rebut identification testimony in these "swearing matches" constitutes objectively unreasonable judgment. *See Toliver v. Pollard*, 688 F.3d 853, 862 (7th Cir. 2012) (quoting *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("'In a swearing match' between the two sides, counsel's failure to call two useful, corroborating witnesses . . . constitutes deficient performance." (alteration omitted)). Thus, trial counsel's failure to call Brooks and Cobb also comprises objectively unreasonable conduct and contributes to the Court's finding of deficient performance.

## B. Prejudice

Having established that trial counsel's omission to investigate or call McNeal, Brooks, and Cobb as witnesses fell below an objective standard of reasonableness, Towers must next show that trial counsel's omissions prejudiced his defense.[12] To do so, Towers must establish "a reasonable chance" that he would have been acquitted had trial counsel investigated and called these witnesses. *Stanley*, 465 F.3d at 814 (adding that "it needn't be a 50 percent or greater chance" and, "given that guilt must be proven beyond a reasonable doubt, guilty people are often acquitted").

### 1. Overall Evidence of Towers's Guilt

---

[12] As a threshold matter on the second prong, the State is correct that the Court's prior opinion did not hold that Towers has already demonstrated prejudice, as his opening brief contends. Indeed, given that the Court found it necessary to hold an evidentiary hearing in order to determine whether Towers's affidavits "are actually true or . . . provide the complete picture of the facts relevant" to his ineffective assistance claim, the Court could not have resolved this question before the hearing. *Towers*, 2019 WL 4166869, at *12 (quoting *Mosley*, 689 F.3d at 852).

The Court begins with the State's assertion that, regardless of what McNeal, Brooks, and Cobb may have stated at trial, the evidence against Towers was too overwhelming for it to have mattered. That evidence comprised Ross's eyewitness testimony and identification of Towers as the shooter; McFulson's similar eyewitness testimony and identification (plus non-identification of Aarian Bonds from the first photo array); Doss's and Harper's eyewitness testimony and identifications of Towers as the driver of the white Bonneville; Towers's similarity to the physical descriptions of the shooter; and the fact that Towers drove a white Bonneville.

In actuality, however, this evidence was far from overwhelming. For one thing, the Seventh Circuit has long recognized that "shortcomings in human perception . . . so frequently render eyewitness testimony less reliable than other types of evidence." *Hampton*, 347 F.3d at 253 (citing *Wright v. Gramley,* 125 F.3d 1038, 1043 n.4 (7th Cir. 1997) (in turn, first citing *United States v. Cook*, 102 F.3d 249, 252 (7th Cir. 1996), and then citing *United States v. Bolton*, 977 F.2d 1196, 1201 (7th Cir. 1992))). And here, the identifications made by Doss and Harper were particularly shaky given that each had earlier identified Aarian Bonds as the Bonneville driver, and only identified Towers once Aarian's photo was removed. *Cf. Towns v. Smith,* 395 F.3d 251, 260 (6th Cir. 2005) (describing a "shaky" identification as "scant" evidence of guilt). Furthermore, given that Aarian drove an identical Bonneville, that vehicle did not tip the scale between him and Towers. In addition, the differences between their physical descriptions were relatively modest. *Compare* Trial Tr. at U-52:10–18, *with id.* at U-58:5–7.

As for Ross and McFulson, the State insists that their eyewitness testimony was especially reliable. But given the inherently less reliable nature of such evidence, the Seventh Circuit has repeatedly characterized cases hinging on a few eyewitnesses, to the exclusion of meaningful physical evidence, as "weak." *See Wright*, 125 F.3d at 1043; *see also Campbell*, 780 F.3d at 770 (finding prejudice where the case relied on three eyewitnesses); *Hampton*, 347 F.3d at 256 (same); *cf. Anderson v. Johnson*, 338 F.3d 382, 393–94 (5th Cir. 2003) (characterizing as "relatively weak" a case depending on two eyewitnesses). Plus, the State ignores the fact that Ross never viewed a photo of Aarian Bonds, while McFulson never viewed photos of Aarian and Towers together. *See Towers*, 2019 WL 4166869, at *3.

The State's cases do not suggest otherwise. In *United States v. West*, the issue was whether the eyewitnesses' identifications were independent of a tainted pretrial identification, which is entirely distinct from whether they defeated a showing of prejudice under *Strickland*. 528 F. App'x 602, 604 (7th Cir. 2013). Similarly, in *United States v. Williams*, the issue was whether an identification resulted from an impermissibly suggestive lineup. 522 F.3d 809, 810 (7th Cir. 2008). In *Watson v. Anglin*, the court rejected the petitioner's argument that he was prejudiced by a "minor discrepancy" in a jury instruction defining murder by pointing to undisputed evidence that he had shot three people. 560 F.3d 687, 692–93 (7th Cir. 2009). Finally, in *Allen v. Chandler*, the court found reasonable the state postconviction court's finding that the evidence of guilt was overwhelming where the eyewitness's account

35

was partly corroborated by a surveillance video. 555 F.3d 596, 602 (7th Cir. 2009). Thus, none of the State's cases are helpful.

### 2. McNeal's Testimony

Turning, then, to the potential effect of McNeal's testimony on the case, the State first invites the Court to "disbelieve" that he would have provided the same testimony back in 2007 as he did at the evidentiary hearing. Resp. Br. at 12; *cf. Stanley*, 465 F.3d at 815 (noting that the first question that arises "[w]hen a defendant's lawyer failed to interview key actual or potential witnesses . . . . is whether they would have told the lawyer the same thing before trial"). In the State's view, McNeal would not have willingly testified against Aarian Bonds, "his close friend," while Aarian was still alive in order to exonerate "a man he insists that he did not know." Resp. Br. at 13.

The Court disagrees and finds by a preponderance of the evidence that McNeal would have provided the same testimony at the time of trial. McNeal explained that he would have done so at length at the hearing, stressing his dismay that an "innocent man is incarcerated for a crime that he didn't commit." 10/2/20 Hr'g Tr. at 28:21–22; *see also id.* at 15:14–21, 23:25–28:14. The Court found that testimony particularly credible. Although it is conceivable that the reality would have been different while Aarian Bonds was alive, mere conjecture does not suffice to overcome McNeal's compelling testimony. That is especially so given that Aarian seemed to have disappeared sometime before the trial, which diminishes the possibility that McNeal would have refused to inculpate him.

36

The State next argues that the admissible portion of McNeal's testimony "would have done little to help the defense." Resp. Br. at 12. In particular, the State asserts that two pieces of McNeal's testimony could not have been offered for the truth of the matters asserted therein under Illinois hearsay rules: (1) that he had lent Aarian his blue Chevrolet Lumina because Aarian said that his white Pontiac Bonneville had been "torn up" in an altercation involving his ex-girlfriend's boyfriend (*i.e.*, Falls) and his brother, Carlos Bonds, 10/2/20 Hr'g Tr. at 22:2–15; and (2) that, upon returning the Lumina, Aarian told McNeal that he had "made the guy" who damaged his Bonneville "pay for it." *Id.* at 26:1–4.

While the State may be correct about the first statement, the Court finds that his second statement would likely have been admissible for its truth under *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Chambers*, the Supreme Court held that a defendant was deprived of a fair trial when he was prevented from offering a third-party's out-of-court confessions that were made "under circumstances that provided considerable assurance of their reliability." *Id.* at 300–01. In *Chambers*'s wake, Illinois courts recognized an exception to the rule against hearsay where a third-party's out-of-court statement is against the declarant's penal interest and "accompanied by sufficient indicia of reliability." *People v. Rice*, 651 N.E.2d 1083, 1087 (Ill. 1995); *see also People v. Bowel*, 488 N.E.2d 995, 1000 (Ill. 1986). Here, both criteria appear to have been met. First, the statement bears sufficient indicia of reliability because it "was made spontaneously to a close acquaintance" close in time to the murder and supported by other evidence. *Chambers*, 410 U.S. at 300. Second,

the statement was against Aarian Bonds's penal interest because, although it may not have been a clear confession, it tended to expose him to criminal liability under the circumstances. *See People v. Tenney*, 793 N.E.2d 571, 587 (Ill. 2002).[13]  What is more, given the record evidence that Aarian was unavailable for trial insofar as he could not be found,[14] the statement may well have been admissible under Federal Rule of Evidence 804(b)(3) as well.  *See Rice*, 651 N.E.2d at 1087 (assuming without deciding that the Illinois Appellate Court properly adopted Rule 804(b)(3) as Illinois law after *Chambers*).

Had Aarian Bonds's purported statement to McNeal that he made the man who damaged his Bonneville "pay for it" been admitted for its truth, the Court finds it more than reasonably probable that the result of Towers's trial would have been different.  Compared to the modest evidence that trial counsel presented in support of the mistaken-identity defense, the statement makes it significantly more likely that Aarian Bonds, not Towers, was the shooter.

The State's counterpoints are unpersuasive.  While it is true that McNeal said he was preoccupied with something when Aarian returned the Lumina, he stated

---

[13]    Pointing to McNeal's testimony that he initially understood Aarian Bonds's statement to mean that Aarian had made the man "pay" for the damage to the Bonneville in a financial sense, the State contends that the potentially inculpatory nature of the statement would not have been clear.  *See* 10/2/20 Hr'g Tr. at 30:13–15.  But at the time, McNeal did not know any of the details surrounding Fall's murder or Towers's case.  *See id.* at 6:8–10 (stating that McNeal did not become aware of the case until 2009 or 2010).  If he had, McNeal would likely have recognized that Aarian may well have been implicating himself in the murder.

[14]    Trial counsel's testimony that he "th[ought] the State called [Aarian Bonds] in on an off day" and that he "may have seen [Aarian] on the street" sometime prior to trial is too shaky to establish otherwise.  *Compare* 10/2/20 Hr'g Tr. at 192:4–8, *with id.* at 167:24–168:2.

credibly that he still "heard everything" Aarian told him.  10/2/20 Hr'g Tr. at 33:7–21.  Moreover, although the jury may not have heard the other statement purporting to show that Aarian's white Bonneville had been torn up in an altercation involving his ex-girlfriend's new boyfriend, there was other evidence connecting Aarian to that altercation, including testimony that Falls had been looking for Aarian on the night in question, that Aarian drove a white Bonneville, and that two of Falls's companions initially identified Aarian as the driver of the Bonneville.

Furthermore, even if neither statement that the State identifies as hearsay could have been admitted for its truth, the Court still finds that the potential effect of the rest of McNeal's testimony suffices to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  Specifically, just two of McNeal's assertions would have been compelling, noncumulative evidence to support the theory that Aarian Bonds was the shooter: (1) McNeal lent the getaway car to Aarian around the time of the murder; and (2) McNeal did not know Towers and had never let Towers in that car.  Especially given that the identity of the getaway car was among the most solid pieces of evidence in the case, such testimony would have lent substantial support to Towers's defense.  And while it would have foreclosed trial counsel's hypothesis that McNeal was the getaway driver, it would have done so by providing stronger evidence that Aarian was the shooter.

The State also protests that, nearly fourteen years later, McNeal was unable "to pinpoint loaning the car . . . to the date of the murder," as opposed to the month of January 2006.  Resp. Br. at 17; *see* 10/2/20 Hr'g Tr. at 18:23–20:22.  But it is

39

reasonably likely that McNeal could have provided a more specific date when the events in question were still fresh. And even if not, that McNeal lent the getaway car to Aarian during the month of the murder—and that Towers had never been in that car—is enough, in and of itself, to instill doubt sufficient to undermine confidence in the jury's verdict.

The State's argument posits that the jury would not have believed McNeal's "self-serving" and "highly impeached" testimony. Resp. Br. at 13. Again, however, the probability that the jury would have believed it remains reasonable. As to impeachment, the State identifies no "good reason to doubt" McNeal's testimony that he did not know Towers, since neither trial counsel's unsupported hypothesis to the contrary nor evidence that Towers and McNeal frequented the same general area establishes otherwise. Resp. Br. at 13. Similarly, the State fails to make out a contradiction between McNeal's testimony, on the one hand, that he did not "often" drive his car back in January 2006 due to psychological issues he had developed in prison, and on the other, that he sometimes made the "quick drive" to Aarian Bonds's house. *Compare* 10/2/20 Hr'g Tr. at 17:3–13, *with id.* at 19:19–20:8. And McNeal's prior felony convictions hardly dictate that the jury would have disbelieved his story. Finally, while is it certainly possible that the jury would have disbelieved McNeal's testimony anyway, it is not probable enough to preclude a showing of prejudice. After all, the only evidence tying him to the crime was the presence of his Lumina at the scene and two compromised eyewitness identifications from the night before.

Accordingly, based on this record, the Court concludes that Towers has established a reasonable probability that, but for trial counsel's unreasonable failure to investigate and call McNeal as a witness, the jury would have acquitted Towers of the murder.

### 3. Brooks's and Cobb's Testimony

Although trial counsel's failure to investigate and call McNeal is sufficient to justify the Court's finding that trial counsel's deficient performance prejudiced Towers's defense, the additional testimony of Brooks and Cobb contributes to that conclusion. Cobb's testimony would have been particularly helpful to Towers, as he could have told the jury that he was attacked shortly before the murder by the driver of a grey Jeep SUV matching the description of Falls's vehicle and several passengers (and with a vodka bottle to boot) after he refused to answer the driver's questions about who owned the house and vehicle that Cobb knew belonged to Aarian Bonds. Contrary to the State's assertion, those questions would have not been hearsay because they did not assert the truth of any matter. *See Harris v. Commonwealth*, 384 S.W.3d 117, 126–27 (Ky. 2012), *as modified on denial of reh'g* (Dec. 20, 2012) (reviewing when courts have found questions to be hearsay and agreeing with the majority rule that non-assertive questions, such as "What are the store's hours of operations?" are not hearsay); *People v. Cook*, 99 N.E.3d 73, 86 (Ill. App. Ct. 2018) (suggesting that Illinois follows the majority rule (citing MICHAEL H. GRAHAM, CLEARY AND GRAHAM'S HANDBOOK OF ILLINOIS EVIDENCE § 801.1, at 635–36 (6th ed. 1994))). And Cobb's admissible testimony about the questions he was asked and the

fight to which they led would have tended to corroborate the theory that Falls had been seeking to harm Aarian, which would have supported trial counsel's theory that Aarian, not Towers, had the motive to kill Falls. Furthermore, Cobb knew both men and could have underscored their physical similarities. *See* 10/2/20 Hr'g Tr. at 91:25–92:5.

It is certainly possible that the jury would have disbelieved Cobb's testimony, for a number of reasons. But as with McNeal, the Court views that possibility to be relatively low. Although Cobb was admittedly intoxicated during the altercation and wound up with a head injury, the Court found his recollection of the key facts to be credible. *See* 10/2/20 Hr'g Tr. at 102:20–25, 109:13–112:2. And while the State notes that Cobb was friends with Towers, it ignores that he was closer friends with Aarian, making him an unbiased witness between the two. *See id.* at 91:22–92:21. As for Cobb's (and Brooks's) prior felony convictions, the Court again finds it improbable that the jury would have placed much weight in them when deciding whether to believe the witnesses' testimony.

Brooks's testimony would have aided Towers's mistaken-identity defense as well. His account of an alleyway fight would have tended to cast additional doubt on the State's theory that Towers was involved in the traffic altercation that provided the impetus for the murder. Although the State stresses that Brooks could not recall the date of the fight, police records indicating that he had witnessed the traffic altercation involving Falls, the white Bonneville, and the grey Focus strongly suggest that he was describing that very altercation. *See* Pet'r's Ex. 4, Chicago Police

Department Case Supplementary Report ID 4740141 at 4, ECF No. 62-3. And while Brooks did not observe the whole incident, and his account did not fully align with others presented at trial, there is still a reasonable chance that the jury would have found his perspective compelling. Lastly, like Cobb, Brooks would have been a relatively neutral witness insofar as he knew both Towers and Aarian and was best friends with Carlos Bonds. *See* 10/2/20 Hr'g Tr. at 57:9–58:9.

In sum, after considering the record, the Court finds it reasonably probable that, but for trial counsel's unprofessional failure to investigate and call McNeal—not to mention Brooks and Cobb—as a witness, the jury would have reasonably doubted that Towers killed John Falls. Accordingly, the Court concludes that Towers's custody violates the Sixth Amendment under *Strickland* and its progeny, and that Towers is entitled to a writ of habeas corpus pursuant to AEDPA.

## C.    *Brecht* Analysis

One additional point needs mentioning. In order for the writ to issue, trial counsel's unconstitutionally deficient performance must have had a "substantial and injurious effect or influence" on the jury's decision to convict. *Brecht*, 507 U.S. at 637; *see Brown*, 142 S. Ct. at 1524. This form of harmless error review focuses on "whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown*, 142 S. Ct. at 1525 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). And importantly, where the evidence is "evenly balanced" as to harmlessness, "the petitioner must win." *O'Neal*, 513 U.S. at 437.

43

As a threshold matter, it is not entirely clear that a separate *Brecht* analysis is necessary in light of the foregoing *Strickland* analysis. The Supreme Court has suggested that, when a habeas petitioner has shown prejudice under *Strickland* or another constitutional claim that includes a prejudice element, it is unnecessary to run through the prejudice inquiry again under *Brecht*. *See Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995). In *Kyles*, the Supreme Court held that a showing of prejudice under *United States v. Bagley*, 473 U.S. 667 (1985), which had adopted the *Strickland* "reasonable probability" standard for showing prejudice in cases of *Brady* violations, *see id.* at 682, "necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Kyles*, 514 U.S. at 435 (quoting *Brecht*, 507 U.S. at 623)). Accordingly, the *Kyles* court explained that once a court has found that a constitutional error is prejudicial under *Bagley*, "there is no need for further harmless-error review." *Id.* In a footnote, the Court recognized the logical implication of its holding—the principle that harmless error review is superfluous in cases where the petitioner has shown prejudice under the standard *Bagley* had borrowed from *Strickland* also makes it unnecessary in cases involving claims under *Strickland* itself. *Id.* at 436 n.9 (quoting *Hill v. Lockhart*, 28 F.3d 832, 839 (8th Cir. 1994) ("It is unnecessary to add a separate layer of harmless-error analysis to an evaluation of whether a petitioner in a habeas case has presented a constitutionally significant claim for ineffective assistance of counsel.")).

44

The Seventh Circuit has not yet stated whether a showing of *Strickland* prejudice necessarily entails a finding of prejudice under *Brecht*. But other circuits have. *See, e.g.*, *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 150 (3d Cir. 2017); *Byrd v. Workman*, 645 F.3d 1159, 1167 n.9 (10th Cir. 2011); *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005); *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000); *Combs v. Coyle*, 205 F.3d 269, 291 n.18 (6th Cir. 2000); *see also Dey v. Scully*, 952 F. Supp. 957, 974–76 (E.D.N.Y. 1997) (discussing at length why *Brecht* analysis is unneeded in cases where "such analysis inheres in the initial finding that the error was constitutionally significant." *Id.* at 974).

Nevertheless, out of an abundance of caution,[15] the Court also will consider Towers's claims under *Brecht*. And, in doing so, the Court has little trouble concluding that trial counsel's failure to call McNeal had a substantial and injurious effect on the outcome of Towers's trial. Recall McNeal's testimony at the hearing that he lent Aarian Bonds his Lumina around the date of the shooting, and that upon

---

[15]     It is unclear whether the Supreme Court's recent decision in *Brown v. Davenport*, 142 S. Ct. 1510, which held that "a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA," *id.* at 1517, abrogates *Kyles* and the above-referenced cases to the extent that they hold that a separate *Brecht* analysis is unnecessary when prejudice is an element of the underlying claim of constitutional error. To be sure, "the Supreme Court shies from overturning its precedents *sub silentio*." *Tully v. Okeson*, 977 F.3d 608, 615 (7th Cir. 2020) (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)), *cert. denied*, 141 S. Ct. 2798 (2021); *see Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484–85 (1989) (instructing that when "a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," a lower court should "follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"); *cf. Brown*, 142 S. Ct. at 1528 ("We neither expect nor hope that our successors will comb these pages for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments . . . ."). But Towers's evidence of prejudice satisfies *Brecht* in any event, and so the Court need not probe the issue any further.

returning the car, Aarian Bonds said to McNeal that he had made the person who damaged his Bonneville "pay for it." McNeal also said he had never met Towers and certainly had never lent him his car. As detailed above, based on McNeal's in-court testimony, the Court finds it very probable that McNeal would have provided, and the trial court would have admitted, the same exculpatory testimony at Towers's trial.

That testimony would have been particularly impactful in light of the weaknesses in the State's case. As described above, the State's evidence consisted of relatively shaky identification testimony and circumstantial evidence that harmonizes equally well with the defense's theory that Aarian Bonds was the shooter as it does with Towers's guilt (*e.g.*, both Towers and Aarian Bonds drove a Bonneville). This evidence was not "so overwhelming that [the Court] can discount the possibility" that trial counsel's errors "had a substantial adverse effect on the verdict." *Wilber v. Hepp*, 16 F.4th 1232, 1260 (7th Cir. 2021).

To the contrary, McNeal's testimony would likely have caused the jury to reasonably doubt whether Towers was the shooter. For reasons explained above, McNeal's account would have substantially strengthened the defense's theory that Aarian Bonds had killed Falls as revenge for the fight that damaged his car. The Court concludes that McNeal's testimony would have nudged that theory over the line of plausibility, such that the jury would not have found Towers guilty beyond a reasonable doubt. Add on Brooks's and Cobb's testimony, which would have materially undermined the State's theory that Towers was the Bonneville driver who

46

had fought with Falls, Doss, and Harper the night before the murder, and it becomes clear that trial counsel's errors were anything but harmless.

Consequently, the Court has "grave doubt" that Towers received a fair trial in light of the ineffective assistance of counsel he received due to trial counsel's failure to call McNeal, Brooks, or Cobb. Accordingly, the Court finds that Towers is entitled to habeas relief under the *Brecht* standard as well.

## IV. <u>Conclusion</u>

For the reasons set forth above, the Court grants Towers's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis of his claim of ineffective assistance of counsel. The State has 120 days, or until January 5, 2023, in which to decide whether to retry Towers; if the State decides not to retry Towers or makes no decision within that period, it must release Towers from prison. *Owens v. Duncan*, 781 F.3d 360, 366 (7th Cir. 2015).

**IT IS SO ORDERED.**                    **ENTERED:  9/7/22**

_____
**John Z. Lee**
**United States District Judge**

47